B. W. BASS v. THE ROANOKE NAVIGATION AND WATER-POWER COMPANY.

*Constitutional Law—Vested Rights—Obligation of Contracts—Corporation—Eminent Domain—Forfeiture—Grant, Presumption of—Easements—License—Reverter.*

1. While the Legislature has no power to authorize the condemnation of private property for the use of purely private corporations, nevertheless, where corporations, otherwise private, are clothed with powers and charged with duties which are in their nature public, they become *quasi* public corporations, and may, with legislative permission, exercise the right of eminent domain.

2. The enactment of statutes regulating the manner in which corporations shall equitably discharge the claims of its creditors, or to subject all or a portion of its property to sale at the instance and for the benefit of creditors, is not in conflict with the constitutional provisions in respect to vested rights or the obligation of contracts.

3. A bare expectancy is not such a vested right as will be protected by the constitutional provisions in that respect.

4. The purchaser of the property of the Roanoke Navigation Company (incorporated under the Act of 1812) under the decree for sale made in pursuance of the Act of 1874–'75, became vested with all the rights, estates and privileges belonging to said company, including the estate acquired either by purchase or proceedings to condemn land for the purposes of the erection and maintenance of the canal contemplated in the act of incorporation; and none of these acquisitions were forfeited by the acceptance and exercise by the purchasers of the power conferred by the Act of 1885 to use the franchise for other purposes not inconsistent with those originally granted.

5. The Roanoke Navigation Company, having acquired the right-of-way through the plaintiff's land, permitted her, by parol license, to erect, in 1852, a private bridge over the canal and which she had continuously used ever since, until it was removed by the defendant, the purchaser and successor of the said company, in 1890 when engaged in improving the property: *Held,* (1) that such possession did not raise a presumption of a grant to the easement to maintain the bridge; (2) that the right to the fee in the condemned land did not revert to the original owner, or those claiming under him, upon the dissolution of the original corporation; (3) that the license could be revoked, and being revoked, the defendant had a right to remove it without paying compensation to the owner.

This was a CIVIL ACTION, tried at May Term, 1892, of the Superior Court of HALIFAX County, before *Brown, J.*

The Judge settled and submitted the following issues:

1. Did the defendant wrongfully destroy the plaintiff's bridge?

2. What damage is plaintiff entitled to recover?

3. Is the plaintiff the owner and entitled to recover possession of the canal and land described in section ten of complaint?

4. Does the defendant wrongfully withhold possession of said land?

5. What damage is plaintiff entitled to recover?

The plaintiff's counsel tendered the following:

1. Did the defendant wrongfully destroy plaintiff's bridge and refuse to replace it?

2. Did defendant wrongfully obstruct plaintiff's way to her land?

3. What·damage has plaintiff sustained by the tearing down of her bridge?

4. Is the plaintiff the owner of the actual canal boundary (160 feet)?

5. Does the defendant wrongfully detain the same?

6. Is the defendant entitled to use that portion of the canal that passes through plaintiff's land for other purposes than those of navigation without the plaintiff's consent?

7. Is the defendant using said canal for manufacturing purposes without the consent of plaintiff?

The plaintiff refused to adopt and submit issues tendered, and objected to the substitution of others for them.

The plaintiff introduced in evidence the different charters of the Roanoke Navigation Company and of the defendant, and the Act of 1874–'75 for the dissolution of the Roanoke Navigation Company.

It is admitted that title is out of the State. It is also admitted that about the year 1818 the land described in the

complaint was the property in fee of Daniel Mason. That the canal boundary running through the same was then condemned, by proper proceedings, for the use of the Roanoke Navigation Company; that B. W. Bass acquired Daniel Mason's title to all the lands subject to said condemnation, and upon his death he devised an estate for her life in said lands through which the canal runs, to plaintiff, his widow.

George W. Fulghum, witness for the plaintiff, testified: "The Roanoke Navigation Company's canal divides and runs through the plaintiff's land. The plaintiff is my sister. My sister used bridge across defendant's canal. She used it in crossing over from one part of her land to another farm on the other side. There was a road running from Bass's home across the bridge; it was only a way used by her. I don't know how long it was in use. I don't know that such way was there when canal was built; I was not born then. It was not a public way. There has been a bridge across canal at this place since 1857, to my recollection. It was used principally by Bass and family and the people on his farm; it was not used by the public. It looked, when I saw it in 1857, as if it had been used for sometime. The way looked as if it was then a much worn and used road. In 1890 the bridge was moved off by defendant, in cleaning out canal, and not restored. Arrington, the Secretary of the Company, told me he had no right to replace the bridge, but that sister might put one there, so she put one that would not obstruct the water of the canal. The bridge removed was worth $25. Mr. Arrington refused to allow plaintiff to put back the same bridge, or one like it. He only agreed that plaintiff might put back a bridge without any posts in the canal; he said plaintiff might put down any such bridge as would not obstruct the waters of the canal. In cleaning out the canal in 1890 it was widened at this point about six or eight feet. Don't think it was deepened at this point. There was also a ford across the canal about three hundred yards up,

used by Mrs. Bass in crossing. Mrs. Bass has no way of getting across now unless she replaces the bridge."

The plaintiff proposed to prove by this witness that plaintiff had crops on her land; that the bridge was torn away in May or June, 1890, and that she could not get to her lands to cultivate them, and claims damage for injury to the land, and failure to plant the crops, and to the crops then planted.

The Court held that such was not the rule of damage.; that the only damage plaintiff could recover was what it would have cost to replace the bridge as directed by Arrington, and plaintiff excepted.

"This canal is not used for navigation purposes. No vessels navigate it now. At its terminus there is a grist-mill and elevator—at Weldon, about two miles from the land of the plaintiff—and the defendant company has never erected any mills, or other works, on the canal boundary running through the plaintiff's land.

"I have never given permission to use the water for any purpose except navigation. I don't know that Mrs. Bass ever did. I am her business agent. Mrs. Bass controls her own property; I look after her business. When I talked with Arrington about putting bridge back, I don't remember that he said anything about our not putting bridge with bench to it. He said we might put bridge there at any time, so we did not obstruct water. Finally, Arrington said he was advised by his counsel that he was not liable for building bridge, but that Mrs. Ponton and sister wanted a bridge, and if we could use one bridge he would pay for one-third. They could have used a common bridge between them. There would have been some little more distance for plaintiff to travel. The tow-path on the canal is there, and as it always has been. Plaintiff has never replaced the bridge at all. There is none there now. The old bridge that was taken away was worth $20.

" I remember back to 1852 or 1853.  There were then a
few boats running on it, and also one mill at Weldon, about
two miles from plaintiff's land.  Canal Company in posses-
sion of it ever since.  My sister could have hauled away the
lumber from the bridge torn down in widening the canal,
and saved it.  I understood the mill was operated by and
belonged to Colonel Long.  It was on the canal and fed by
water of the canal.  I don't think the Canal Company oper-
ated any mill.  In order to widen the canal at this point it
was necessary to remove the bridge.  Don't remember that
any boats have been run on canal since the war.  The Guil-
ford Gee bridge is about a mile from plaintiff's."

.R. J. Bond, witness for plaintiff, testified : " I had charge
of laborers in cleaning out canal.  Major Waite was engineer.
I had bridge torn down by his orders.  Mrs. Bass asked to
let the bridge remain awhile, but the engineer said the work
must be completed as we went.  It· was necessary to tear
down bridge, as canal was widened ten feet additional width
and is a foot deeper.  This was necessary to put canal in
proper condition.  The bridge would have dropped in canal
necessarily while we were repairing and widening canal if
we had not moved it.  The timbers were as good as ever
It would have cost about ten dollars to replace the same
bridge."

The plaintiff here rested her case.

It was admitted by plaintiff that under the charter of the
Roanoke Navigation Company the land in controversy
through which this canal runs was duly and regularly con-
demned to the width of eighty feet on each side of centre of
canal, and that present width of canal is thirty-five feet.
This admission was only for the purposes of this suit.

David Ray, witness for defendant, testified : " The Roan-
oke Navigation Company has been in possession of this canal
for over forty years within my memory.  It has used the

canal and had possession of it for over forty years. Had boats on it before the war; none on it since."

J. L. Bass, witness for defendant, testified: "Am seventy years old. Ever since I can recollect the Roanoke Navigation Company were in possession of this canal running through plaintiff's land. I recollect as far back as 1830. They used the canal and tow-path. Had boats on it before the war."

The record in case of *State ex rel. Thomas S. Kenan, Attorney General,* v. *Roanoke Navigation Company,* is put in evidence by the defendant; and also the deed from Thos. N. Hill, receiver, to the Roanoke Navigation and Water-power Company.

S. P. Arrington, witness for defendant, testified: "Am managing director of defendant. Defendant has had possession of the canal and right-of-way constantly since 2d October, 1882, date of deed from Hill, receiver. It was necessary to remove this bridge to utilize canal—dig it out and widen. We could not get water in the canal sufficient without this. I told Fulghum that Mrs. Bass might replace and use the bridge if she did not obstruct the water. I have left locks on canal, and propose to use it for navigation, if it pays me to do so. I do not navigate now, except a working boat. We let in water in canal again after we repaired it on November 26, 1891. Not used any boats on it since for hire. I also have mill and elevator at Weldon, and expect to use the water also for manufacturing purposes. We have rented out land on right-of-way; also repaired canal along its way. I do not remember any particular act or work done on the canal where it passes through the Bass land prior to 1889, by me or my present company. The main purpose of development of the canal is for manufacturing purposes."

W. E. Daniel, witness for defendant, testified: "I rented out houses on the canal for defendant company. These houses were in Weldon."

The defendant offered in evidence a deed from one Hudson to The Roanoke Navigation Company, dated 1823, conveying land adjoining *locus in quo.* The plaintiff objected to this evidence. Objection overruled, and the deed admitted. The plaintiff excepted.

T. A. Clark, witness for defendant, testified: "I have lived in Weldon since 1854 or 1855. There were three mills there on the Canal Company's land, run by water drawn from the canal by race-ways. These mills remained there up to a few years ago. They were not owned by The Roanoke Navigation Company. Boats ceased to run on the canal between 1854 and 1858. The defendant had possession of canal and its property after The Roanoke Navigation Company. The mills were in possession of Mr. Emry in 1886; he worked on the canal. The old company did no work on the canal in the last ten or twelve years, and the defendant did none until they began improving the canal in 1890."

The plaintiff submitted several prayers for instruction, and excepted to the refusal to give them. The points raised by these are discussed in the opinion.

The Court intimated that it would charge the jury—

1. That the evidence did not establish an easement in the bridge; that there was no evidence that the use of it was not permissive; that in any view of the evidence the defendant had a right to remove it if necessary to repair the canal; that it was the plaintiff's own folly not to replace it when given permission; that there is no evidence that prior to Act 1856 plaintiff had an easement in this bridge.

2. That as to third issue: in any view of the evidence, if it is believed by the jury, together with the admissions in the cause, the jury should answer that issue and the fourth issue No.

Thereupon the plaintiff submitted to nonsuit, and appealed.

*Mr. R. O. Burton,* for plaintiff.
*Messrs. T. N. Hill* and *W. H. Day,* for defendants.

Avery, J.—after stating the case as above, proceeded: It is not necessary to the decision of the questions involved in this appeal to determine whether the English doctrine in reference to the grantor's right of reverter, when corporations are dissolved, prevailed in North Carolina in any case, or whether we would follow the equitable rule adopted by the Courts of some of the States, in the absence of positive and constitutional legislation bearing upon a given state of facts. The authorities elsewhere are conflicting, and thus far the question has not in all of its bearings been definitely settled by this Court. 2 Waterman on Cor., § 435; Angell and Ames on Corp., § 779; *Mason* v. *Mining Co.,* 133 U. S., 50; 2 Morawitz Pr. Corp., §§ 1031 and 1032; *Bowen* v. *Robertson,* 11 How., 478; 2 Kents Com., pp. 307, 309; *Von Glahn* v. *DeRosset,* 81 N. C., 467; *Fox* v. *Horah,* 1 Ired. Eq., 358; *Gooch* v. *McGee,* 83 N. C., 59; *State* v. *Rives,* 5 Ired., 297; *Hughes* v. *Commissioners,* 107 N. C., 607.

Leaving out of view the learned discussion of this subject by Chief Justice Smith in *Von Glahn* v. *DeRosset* and *Gooch* v. *McGee, supra,* in which the suggestion was made that the older decisions presented the status of a corporation whose charter had been forfeited in a court of law as distinguished from a court of equity, we think that the controversy here may be made to depend upon the application of the provisions of our own statutes prescribing what disposition shall be made of property in case of dissolution.

The Roanoke Navigation Company, whose franchise and property are claimed by the defendant by virtue of a purchase at a sale under judicial decree, made pursuant to previous legislation, to which we will presently advert, was

originally incorporated under the authority of the Act of 1812 (2 Rev. Stat., 236), which was amended by several subsequent acts, passed respectively in 1815, 1816, 1817, 1823 and 1832. Sections 8 and 12 of the Act of 1812 provided that the real estate, whether acquired at private sale or by condemnation, should be "vested in the said proprietors, their heirs and assigns forever, as tenants in common in proportion to their respective shares." So that the original owners, either voluntarily or by the exercise of the right of eminent domain, if they received the full price of the fee would lose nothing, if the land should never revert. In creating such a *quasi* public corporation for the purpose of opening a channel for commerce, the parties and juries who determined values of land acquired are deemed to have acted upon the idea then evidently controlling the Legislature, that a great public highway would be prepared for permanent use, and that in case one set of proprietors should forfeit their rights for misuser or non-user, the law-making power of the State would see that the property necessary to subserve this important end should pass to another similar public agency or be subject to the control of the sovereign power which had authorized it to purchase and hold lands in fee for a particular purpose.

The Legislature could not have authorized the taking by a private corporation for purely private purposes, but such bodies politic, as companies organized to manage railway lines and canals for transportation of persons and property, though in other respects private corporations, are like counties and towns from their very nature, take and hold such property as is necessary for corporate purposes under a delegation of sovereignty by the State, and subject to the authority of the State "to provide specially how its indebtedness shall be paid, and to subject all or a portion of its property, to sale under execution, or in any other mode at the instance of a

creditor." *Gooch* v. *McGee, supra; Railroad* v. *Caldwell*, 39 Pa , 337; *Hughes* v. *Commissioners, supra.*

The exercise of the power to provide how they shall fairly and equitably discharge the claims of creditors is not inhibited as disturbing vested rights, or impairing the obligation of contracts. Indeed, apart from such legislative control over it as inheres in its very creation to a public or *quasi* public corporation, the law-making power of the State has the unquestioned right to provide the means of enforcing existing contracts, as distinguished from the power of imposing a new obligation, divesting a right or destroying a remedy. Hare's Con. L. pp 787 and 789; Cooley Const. Lim. (4 Ed.) p 469; *Munn* v. *Illinois*, 95 U. S., 126, 130.

Even if the Courts, in the exercise of equity jurisdiction, could not, before the passage of our statutes, take the property of a *quasi* public corporation in custody for the payment of its debts, the Legislature, according to all of our authorities, had ample power to provide what portion of the property necessary for corporate purposes shall be subject to sale, and when and how it shall be sold for that purpose. *Gooch* v. *McGee, supra.* The primary object in permitting the exercise of the sovereign power of eminent domain was to take the land for a public purpose, and the condition implied in the very creation of the corporation, was that the creator should supervise the artificial being, so far as to see that it, or another similar agency, should subserve the end for which it was brought into existence; the power of the State being subject only to the limitations imposed by the Constitutions, State and Federal.

The power of the Legislature to pass substantive laws is limited only by the restrictions as to vested rights and contracts. We have seen that legislation providing adequate means for the enforcement of existing contracts is not within the constitutional inhibition as to impairing the obligation imposed by them.. On the other hand, a bare expectancy,

such as that of the heir presumptive under the canons of descent, the devisee named in a last will and testament executed by a person still living; the claim to rights by survivorship by a joint tenant, where a statute has made them tenants in common, the right to a forfeiture of interest reserved on a contract on account of usury, is not (as it has been held) protected as a vested right, but may be modified or destroyed at the will of the lawmakers by statute. Cooley Const. Lim. (4 Ed.) pp. 445 and 447; Osdronaux Con. Leg., p. 601; Tiedman on Lim. of P. P., p. 348 to 350; Lawson R. & R., sec. 3867, p. 6088, and note. *Parmolie* v. *Lawrence,* 44 Ill., 405; *Holbrook* v. *Finny,* 4 Mass., 567; *Westowell* v. *Gregg,* 12 N. Y., 208; *Loverer* v. *Lamprey,* 22 N. H., 434; 3 Am. and Eng. Enc., pp. 758 and 759; *Mingo* v. *Gilmann,* 1 Hay., 270. The law applicable in our case, is, by its terms, retrospective, and we do not think that the Legislature transcended the limit of its powers in providing for the substitution of one public agency instead of another, and thereby postponing the possibility of reverter, if it existed at all. That such contingent claim to the reversion is, at best, where admitted to exist, only an expectancy defeasible at the will of the State, is made more apparent when we recall the admitted principle that it rests with the sovereign to insist upon the forfeiture for failure on the part of the corporation to comply with its charter, and if, in our case, the State had not moved, and should never move, in the matter, there could be no dissolution. *Railroad* v. *Saunders,* 3 Jones, 126; *Railroad* v. *Johnston,* 70 N. C., 348; *Navigation Company* v. *Neal,* 3 Hawks, 520.

A claim, contingent upon action by the Legislature, or by the Executive Department of the State, that may never be taken, would seem clearly so remote and uncertain as to fall under the denomination of an expectancy, subject to destruction by the power which alone could create the contingency, or could refrain from so doing at its pleasure. Supposing that the Act of 1831 did not apply to a strictly private corporation

111—29

whose charter had expired by its own limitation, as declared in *Fox* v. *Horah*, 1 Ired. Eq., 358, or to a *quasi* public corporation, dissolved either for violation or by expiration of its charter, the Legislature had nevertheless the same power to pass the Acts of 1871 and 1872 (Bat. Rev., chapter 26, §§ 39 and 46), and the Act of 1874–'75, chapter 198, as to enact that which took effect twenty years before, but after the property of the Navigation Company had vested under its charter and the laws amendatory thereof.   The validity of the last-named act has been expressly acknowledged in *Gooch* v. *McGee, supra*, and inferentially in *State* v. *Navigation Co* , 86 N. C., 408, as well as by approval of the principle in *Fox* v. *Horah, supra*.   It provides that before a judgment of dissolution, the Court may appoint a receiver and make other orders, as prescribed in chapter 26, section 39 of Battle's Revisal, and that "such sale and conveyance shall pass to the purchaser or purchasers at the sale, not only the works and property of the company between the towns of Gaston and Weldon, and at Weldon, as aforesaid, as they were at the time of rendering the judgment of dissolution, but also all such franchises, rights and privileges as said company or corporation now have by law.  *  *  *  The corporation thus created by such sale and conveyance shall succeed to all the rights, franchises and privileges as are now had and enjoyed by the Roanoke Navigation Company between the towns of Gaston and Weldon, and at Weldon."

Under the decree of the Court, rendered in pursuance of the Act of 1874–'75, R. T. Arrington, S. P. Arrington, William Mahone and J. D. Cameron became purchasers.   They, under the corporate name of "The Roanoke Navigation and Water-Power Company," were clothed by another statute (Private Laws 1885, chapter 57) with every right, &c., of the former company, "including the right to the use of the water of the Roanoke River, to be drawn through the canal for navigation, *manufacturing* or *other purposes*, and are vested with every

right to own, use and enjoy the water-power of said Roanoke Navigation Company, to rent or lease the same," &c. The State of Virginia, in the year 1816, passed an act giving to the Roanoke Navigation Company, organized under the law already referred to, the exclusive right to improve the navigation of so much of the Roanoke River and its branches as were situate in that State, permitting individuals and banks to subscribe an additional sum of two hundred thousand dollars to be applied for that purpose, and providing for the condemnation of land necessary for right-of-way, &c. By its terms, this charter was to be accepted by the stockholders of the company in order to give it validity, as it afterwards was, and the General Assembly of North Carolina gave its formal assent by statute the next year. 2 Rev. Stat., page 252.

If the act be considered as applicable, by virtue of the mere assent to the consolidation on the conditions prescribed by a sister State, to the portion of the canal lying in North Carolina, so far from construing section 5 as a restriction upon the rights of the old company, it seems rather to raise the implication that it had the exclusive right to use the canal for water-works (which seems to be, sometimes at least, synonymous with milling or manufacturing purposes as used in these old statutes) erected upon its own right-of-way, and to prohibit the withdrawal of water from the canal by everyone owning an eligible situation for putting up machinery in the vicinity of its line, except with consent of the company, upon which the duty of entering into an agreement with the owner of the site on reasonable terms was required. The language is not at all clear, but taking the whole context into consideration, the only interpretation that seems to be reasonable and consistent with the general purpose to permit the use of the water of the canal for mills, in subordination to the main object of using it as an artery of commerce is first; that neither the company nor an individual can withdraw the water from the canal and convey it over the land of another landowner

to reach an eligible site for utilizing it as a power without the consent of such owner, but may with such consent; and that the duty is imposed upon the company, where it can be done without interfering with the primary business of navigation, of farming out at reasonable rates a sufficient supply of water to the "situation" owner. It will be observed that the company is empowered and directed, if it can be conveniently done, to make the "canal answer both the purposes of navigation and the water-works aforesaid," and to agree with the "person possessing such situations" concerning the just proportion to be borne by each of the expense, not of cutting a single canal for boats, but making "canals or cuts" that would subserve the purposes both of navigation and such water-works. The new company is now contending for the privilege of using the water itself and farming it out to be used for manufacturers, with due regard to the rights of others.

But the action taken by our Legislature was one of the early recognitions of the right of two distinct corporations organized under the laws of different States to become consolidated with the assent of such States, and with enlarged or restricted powers and privileges lodged in the new company. *Meyer* v. *Johnson*, 64 Ala., 656; 3 Wood R. F., p. 1680, *et seq.* Though corporations are consolidated, they are still often left by the agreement and legislation so far separate that each remains subject to the laws of its own State. 1 Wood, *supra,* page 32. In such cases each charter remains in force, though there may be conflicts in their provisions. 1 Wood, *supra,* page 573, note 5. The two may be operated together with enlarged powers, or with restrictions imposed as a condition precedent to the exercise of the power to consolidate.

Unless the power is specially reserved when the charter is granted, or under the Constitution or general laws, the Legislature cannot, as a general rule, modify the charter so as to take away any power which would enure to the profit of, or prove a protection to, a company from loss, but there is no

restriction upon the right of the sovereign to enlarge its powers or extend its privileges, except that, in doing so, it must not infringe upon the vested rights of another. If there was no authority given to the old company, either in terms or by necessary implication, to erect manufacturing establishments and use the water for running them, and others owned by landowners in the vicinity, the Legislature unquestionably had the power to grant *de novo* all of the privileges enumerated in section 1, chapter 57 of the Laws of 1885, if such action was in conflict with no right but only with the claim of the plaintiff as the devisee of one of the original grantors, to the possibility of reverter, which the Act of 1874–'75 provided should not vest, if it otherwise would have done so on the dissolution under the act. The Legislature, in the exercise of its authority, and in order to make the corporation responsible to its creditors and to turn over any balance to the stockholders, interposed and destroyed any expectancy that the plaintiff or her grantor might have claimed. Having parted with his property, in the most favorable view of the law, in contemplation of the right to exercise such legislative power, the plaintiff has no just ground for complaint. The defendant bought on the invitation of the State in order to satisfy these just claims, and with the assurance of the sovereign that it would succeed to the franchises and powers of the old company, and have the right to ask for additional privileges.

We see no force in the argument that the defendant's right to the land, conveyed by the person through whom plaintiff claims, has been forfeited by accepting the new charter, which confers the power to erect and operate manufacturing establishments, and to lease water to run other mills, and, by non-user, for navigation. In falling back upon this position, it is conceded, by implication, that the sale under the Act of 1874–'75, when the intention to use the water exclusively as a water-power was not as yet disclosed, was valid and passed

the title to the property and franchise to the purchaser. But it is contended that the franchise has been again forfeited. The reply is, that only the sovereign State itself can demand the forfeiture and assert its right to dissolve the corporation. 3 Wood, *supra,* sec. 497; Waterman on Corp., sec. 42, p. 155.

It is, perhaps, unnecessary to say that our Legislature, in providing by statute (*The Code,* § 1849, *et seq.*) for the condemnation of land for the purpose of erecting mills thereon, classifies a corporation that erects mills generally as one of those private corporations which enjoys a prerogative franchise because of some powers or duties, which it is to perform for the public, and to that extent is *quasi* public. 1 Wood, *supra,* sec. 5. If the sale had been authorized by the Act of 1874–'75 for the express purpose of creating a new company, clothed with the power to erect manufacturing establishments and lease water-rights to other mill-owners, it might be questionable whether the probable benefits to the co-terminous landowner would not be greater than if the canal were still kept open for the passage of boats, which can no longer compete with the numerous railroads that traverse the country which the navigation company was organized to develop.

What we have said disposes of the exception arising out of the second cause of action, in which the plaintiff claims possession of so much of the right-of-way, extending eighty feet on each side of the center of the canal, as lay originally within the limits of the land of her former husband, Daniel Mason, under whom she holds as his devisee for life. There was no error in refusing to charge that the land in controversy had reverted.

Having the right to clear out and enlarge the canal, the defendants could revoke any license given by its predecessor or its agents to erect a bridge such as interfered with the enjoyment of its franchise. *Railroad* v. *Railroad,* 104 N. C., 669. The husband of the plaintiff before his death, and the

plaintiff since his death, had been using a bridge across the canal for about forty years, under a parol license from the Roanoke Navigation Company, given to him. There was no evidence that the bridge was used further back than 1852; certainly, no testimony to show that the crossing was erected on an old-established way existing when the canal was constructed. The question does not arise as to its obligation to keep up the bridge, under the statute now applying to railroad companies (*The Code*, § 1710; Rev. Code, ch. 60, § 30), which seems to have been first enacted in 1855. The bridge was placed directly across the stream from which the defendant had a right to remove any obstruction that interfered with widening the channel at that point. The occupation and use by the plaintiff and her husband for over forty years would raise no presumption of a grant—the condemnation of the land under the old charter being admitted. *The Code*, § 150; *Railroad* v. *McCaskill*, 94 N. C., 746. We think that the defendant had the right to remove the bridge as a nuisance, and was under no legal duty to replace with another after widening the canal. Without specific mention, we have discussed the exceptions growing out of the refusal to give the proposed instructions, and have reached the conclusion that there was no error in such refusal, nor in the intimation as to the instruction that would be given.

With great respect for the learned counsel who pressed the exceptions as to issues, we do not deem it necessary to follow his argument in detail. In view of what we have already said, it seems manifest that the plaintiff was not deprived of the opportunity to present any view of the law arising out of evidence. If the issues tendered had been adopted, the instruction proposed to be given by his Honor would have been equivalent to telling the jury (and we think correctly) that in any view of the evidence they should respond to the first, second, fourth and fifth issues "No;" to the third "Nothing;" and to the sixth and seventh "Yes;" and noti-

fying counsel that upon such verdict he would give judgment for the defendant.

The plaintiff was not deprived of the opportunity to present any view of the law arising out of the testimony, and the exception is therefore untenable. *Denmark* v. *Railroad*, 107 N. C., 185; *Boyer* v. *Teague*, 106 N. C., 576; *Bonds* v. *Smith*, 106 N. C., 553; *Emry* v. *Railroad*, 102 N. C., 209.

Since the plaintiff was, in no view of the evidence, entitled to recover damage, it was not material whether his Honor stated the rule for assessing damage correctly or incorrectly in passing upon the testimony. The rejected evidence, if admitted, would not have given the plaintiff a better status in Court, or entitled her to a hearing on any issue arising on any pleadings and evidence, and there was no error from which plaintiff sustained any injury, if, in fact, there was error at all.

If the defendant offered the deed for the tract of land adjoining the land in controversy to establish a boundary, it was probably competent for that purpose. But it was incumbent on plaintiff to show, in some way, how the error complained of operated to his injury, and as we cannot see how he was prejudiced by its admission, we conclude that, if an error, it, too, was harmless.

Upon a review of the whole record, we are of opinion that the judgment below should be

Affirmed.