ROANOKE RAPIDS POWER COMPANY *v.* ROANOKE NAVIGA-
TION AND WATER POWER COMPANY.

(Filed 28 May, 1912.)

1. Arbitration and Award—Matters Concluded—Subsequent Action.

An arbitration and award will not conclude matters not sub-
mitted or passed upon therein, and in this case the action is not
therefore barred upon the question of whether the plaintiff was
authorized under the statute to build a wing dam in the Roanoke
River to the damage of the defendant, a lower riparian owner.

2. Contracts—Actions—Temporary Adjustments—Pleas in Bar.

The agreement entered into between the parties in this case,
affecting a temporary adjustment, held not to affect the defend-
ant's rights as a lower riparian owner to the use of the water
interfered with by a wing dam built by the plaintiff in the
Roanoke River. The decision in this case, *Power Co. v. Naviga-
tion Co.*, 152 N. C., 472, affirmed.

3. Water and Watercourses — Riparian Rights — Interpretation of
Statutes.

The defendant was a purchaser, under a decree entered in a
suit authorized by the Acts of 1874-75, chap. 198, which was rati-
fied by Private Acts of 1885, chap. 57, and which vested in the
purchaser, as a corporation, "the franchises, rights, privileges,
works, and property of the Roanoke Navigation Company, as
acquired by the sale," etc. The Private Laws of 1891, chap. 2,
conferred certain other rights upon the plaintiff corporation,
including, among other things, "the right to erect mills and facto-
ries on the lands situated on Roanoke River," with the right to
the use of the water of the river for manufacturing purposes:
*Held*, the defendant acquired the property with the restriction
or qualification, expressed in the statutes, that in the use of the
water for the purposes specified it should not interfere with
other riparian owners.

4. Words and Phrases — Persons—Corporations—Interpretation of
Statutes.

The use of the word "person" in the plaintiff's charter, that
in the exercise of the rights and privileges conferred it shall not
"prevent any person owning lands on Roanoke River from operat-
ing or erecting any mill," etc., is held to include corporations.

5. Water and Watercourses — Riparian Owners — Vested Rights —
Due Process—Constitutional Law.

When riparian rights in a river have become vested, the
owner of the lands holds them subject to the rights of the public,

as, for instance, the right of navigation, and can only be deprived of them by due process of law and upon compensation being paid him.

PETITION to rehear. The facts are sufficiently stated ,in the opinion of the Court by *Mr. Justice Walker.*

*W. E. Daniel and Claude Kitchin for plaintiff.*

*E. L. Travis, George Green, J. H. Pou, Rutledge & Hagood, Mordecai & Gadsden, and J. C. Spooner for defendant.*

WALKER, J. This is a petition to rehear the above-entitled case, which was decided at Spring Term, 1910, and is reported in 152 N. C., 473.

A careful consideration of the briefs and arguments of counsel upon the rehearing have not disclosed any matter or authority that was overlooked by us at the former hearing. The case was then presented ably and learnedly by counsel, with a full citation of the authorities, and while it has been again argued with still more elaboration, nothing has been brought forward which induces us to change the opinion of the case we then held or the conclusion we reached.

As to the arbitration of the controversy between George P. Phillips and the Roanoke Navigation and Water Power Company, and the award of Judge Armfield and Mr. Lanier, who were the arbitrators, we are still of the opinion that the submission to arbitration did not embrace the matters involved in this suit. The various controversies pending between Phillips and the Navigation Company, and recited in the preamble of the submission, are not set forth with sufficient particularity to enable us to determine their exact nature and extent, but it sufficiently appears that the question to be decided by the arbitrators was whether the Navigation Company could enlarge the canal on its own land, and enjoy the use of the water of the Roanoke River, as it was accustomed to do at and before that time, without the consent of Phillips, and the arbitrators answered both questions affirmatively. A careful reading of the submission and award will show conclusively that the question now raised as to the right of the defendant, as successor to the Navigation Company, to dam up Little River by extending the

present obstruction from bank to bank, so as to deprive lower proprietors altogether of the use of its waters, was not involved in that submission and award. The Navigation Company was making no such claim as against Phillips, and it is clear that the arbitrators, both among the most eminent lawyers of the State, did not understand that they had been asked to decide any such question. But if they did so think, it is sufficient to say that the award does not disclose any attempt by them to render any such decision. So far as the use of the waters of Roanoke River was involved in the arbitration, the only question was whether the Navigation Company could exercise the rights and privileges with respect to the waters of the river which were conferred by its charter, without the consent of Phillips, and the arbitrators, in making their award upon this part of the submission, use the language of the charter (Acts of 1885, chap. 57) in defining the rights of the Navigation Company in the river, without any reference to a larger and more comprehensive use thereafter, and without any suggestion in regard to it. It may be added to what we formerly said upon this subject, and to what we have already stated herein, that even if the arbitrators had made any such ruling, it could bind and conclude the plaintiff only to the extent of its ownership of the land it acquired by purchase from Phillips, and not the other land below the Phillips tract, which will be injuriously affected by damming the river. *Foster v. Parham,* 74 N. C., 92; *Kissam v. Gaylord,* 46 N. C., 294; 16 Cyc., 695.

The agreement of 5 May, 1897, which may, not inappropriately, be called a *modus vivendi,* cannot be allowed to prejudice the rights of the plaintiff, so far as the matters now in controversy are concerned. It was manifestly not intended to have any such effect. The parties carefully guarded their rights against any such inference from their arrangement, which was made to provide temporary relief for the parties, pending a final adjustment or settlement of their controversies. This will appear from the language of the agreement. Defendant expressly stipulated that the license or permission therein granted by plaintiff should not be construed as a waiver or a concession to the Roanoke Navigation and Water Power Company

"of any of its rights, franchises, and privileges to have the waters of Roanoke River flow by and through and upon its property to the extent it is entitled to use and enjoy said waters for any purposes for which it has the right to apply the same." And the plaintiff agreed that the license or permission therein granted the defendant should not be construed "as a waiver of or concession to the Roanoke Rapids Power Company of any of its rights, franchises, and privileges to draw the waters of Roanoke River into its canal to the extent and for the purpose it was entitled so to do." It would not be right, and of course not just, to permit defendant to construe or use that agreement in a way contrary to its own express stipulation. The correspondence of the parties shows that plaintiff was all the time denying the right of defendant to use more of the water of the river than was necessary for the purpose of navigation, and warning defendant that it would assert its right to damages for any greater diversion of the water from the river into the canal. In that correspondence, at or about the time the said agreement was made, the following letters passed between the parties. Defendant wrote to plaintiff: "It is only necessary to refer to two statements contained in your communication: first, the claim that your company 'under and by virtue of its charter owns the right to the exclusive use of so much of the waters of the Roanoke River as it may need for navigation, manufacturing, or other purposes, now or at any future time,' and, secondly, that 'it objects to any use on your part (meaning the undersigned company) of the waters of the said river, or the construction of any dam or other works that will in any manner injure, impair, or interfere with its property, rights, franchises, or privileges.'" Plaintiff replied: "We do not propose, in the construction and maintenance of our works, to interfere with or encroach upon your company's property, rights, franchises, and privileges 'in any unreasonable manner, to the substantial injury' of your corporation. We deny that you have any right, exclusive or otherwise, now or at any future time, to use the waters of Roanoke River for purposes other than navigation. The sole purpose of the incorporation of the Roanoke Navigation Company was to remove the obstructions in Roanoke River,

from Halifax westward, so as to afford a safe and uninterrupted passage for boats carrying freight and adapted to the limited capacity of the stream. The quantity of water appropriated and drawn through the canals of that company at the time when the river was the only channel of commerce and in public demand and favor did not perceptibly affect the flow down the natural channels of the stream. The surplus water which continued to flow down these natural channels belongs to the owners of the water rights on the margin of the stream below." It then notifies the defendant that it will defend its rights as a lower riparian proprietor against any encroachment of the defendant by a greater diversion of the waters of Roanoke River than it is authorized, under the law, to create by obstructions in the river. Then followed the agreement which we have before mentioned, by which active controversy was suspended and all rights of the parties reserved. It is useless to pursue this subject any further.

This brings us to a construction of the judgment in *Bass v. Navigation Co.*, 111 N. C., 439, which, the defendant contends, brings into play the rule of *stare decisis* as to the issues involved in the present suit, so far as the same questions were decided in that case as are raised in this one. We have reëxamined that case with the greatest care, and are unable to see that the issues in the two cases are at all identical. The fifth headnote states with sufficient accuracy the points decided in the *Bass case*. It is as follows:

"The Roanoke Navigation Company, having acquired the right of way through the plaintiff's land, permitted her, by parol license, to erect, in 1852, a private bridge over the canal, which she has continuously used ever since, until it was removed by the defendant, the purchaser and successor of the said company, in 1890, when engaged in improving the property: *Held*, (1) that such possession did not raise a presumption of a grant of the easement to maintain the bridge; (2) that the right to the fee in the condemned land did not revert to the original owner, or those claiming under him, upon the dissolution of the original corporation; (3) that the license could be revoked, and, being revoked, the defendant had a right to remove it without paying compensation to the owner."

*Justice Avery* in that case says distinctly that the only reasonable interpretation of the charter of the defendant (Acts of 1885, chap. 57, sec. 5) is "consistent with the general purpose to permit the use of the water of the canal for mills, in subordination to the main object of using it as an artery of commerce." The company was required, if convenient and possible to do so, to make the "canal answer both the purposes of navigation and waterworks." He does state that "the new company is now contending for the privilege of using the water itself and farming it out for the purpose of manufacturing," but he does not pass upon that contention, as it was not one of the questions in the case, and, besides, it will be noted that what he says in respect to this claim does not extend so far as to embrace the right to the exclusive use of the entire flow of the Roanoke River. He refers only to the assertion of a right to use the canal in its then state or condition, with the wing dam extending only partly across the river for the said purposes.

The leading question in the case is whether the defendant, as successor of the Roanoke Navigation Company, can appropriate all of the waters of Little River to its own use by extending its dam to the other bank and thereby depriving the plaintiff, a lower riparian proprietor, of all use of the stream; which, as it alleges, will result in the destruction of its property. We held before that it could not be done, and we are still of the same opinion. In order to show that the defendant has no such right, we may well confine ourselves to a consideration of the Laws of 1885, chap. 57, and the Private Acts of 1891, chap. 2, being the amended charters of the two companies, without entering upon a discussion of the plaintiff's rights as a lower riparian owner, in order to demonstrate that it has no such rights which the general law recognizes and will protect against invasion or impairment by the defendant.

In our former opinion we stated that the right of the defendant to use the waters of the canal under the Acts of 1817 and 1885 was incidental to the public navigation of the river. In other words, that the defendant and its predecessor are authorized by those acts to use for the said purpose only the surplus water of the canal that would otherwise run to waste. We think

now that this view is sustained by an important decision upon
the subject which was rendered in *Kankanna Co. v. Canal Co.*,
142 U. S., 254. As the case bears so directly upon the question
now under discussion, we may be permitted to extract copiously
from it:

"It is probably true that it is beyond the competency of the
State to appropriate to itself the property of individuals for
the sole purpose of creating a water power to be leased for man-
ufacturing purposes. This would be a case of taking the prop-
erty of one man for the benefit of another, which is not a consti-
tutional exercise of the right of eminent domain. But if, in the
erection of a public dam for a recognized public purpose, there
is necessarily produced a surplus of water, which may properly
be used for manufacturing purposes, there is no sound reason
why the State may not retain to itself the power of controlling
or disposing of such water as an incident of its right to make
such improvement."

Again, at page 274, the Court says: "In *Little Miami Ele-
vator Co. v. Cincinnati*, 30 Ohio St., 629, 643, the right to lease
surplus water for private use was recognized as an incident to
the public use of a canal for the purpose of navigation, but it
was held that such use was a subordinate one, and that the right
to the same might be terminated whenever the State, in the
exercise of its discretion, abandoned or relinquished the public
use. It was doubted whether the State could, after abandoning
the canal as a public improvement, still reserve to itself the
right to keep up a water power solely for private use and as a
source of revenue. By so doing, says the Court, 'the water
power would cease to be an incident to the public use, and the
State would be engaged in the private enterprise of keeping up
and renting water power after it ceased to act as a government
in keeping up the public use.' The same ruling was made by
this Court in *Fox v. Cincinnati*, 104 U. S., 783. See, also,
*Hubbard v. City of Toledo*, 21 Ohio St., 379." The Court also
relies on *Spaulding v. Lowell*, 23 Pick., 71; *French v. Inhabit-
ants of Quincy*, 3 Allen, 9; *Attorney-General v. Eau Claire*,
37 Wis., 400 (*s. c.*, 40 Wis., 533), and then proceeds to say:

"The true distinction seems to be between cases where the dam is erected for the express or apparent purpose of obtaining a water power to lease to private individuals, or where in building a dam for a public improvement a wholly unnecessary excess of water is created, and cases where the surplus is a mere incident to the public improvement and a reasonable provision for securing an adequate supply of water at all times for such improvement. No claim is made in this case that the water power was created for the purpose of selling or leasing it, or that the dam was erected to a greater height than was reasonably necessary to create a depth of water sufficient for the purposes of navigation at all seasons of the year. So long as the dam was erected for the *bona fide* purpose of furnishing an adequate supply of water for the canal, and was not a colorable device for creating a water power, the agents of the State are entitled to great latitude of discretion in regard to the height of the dam and the head of water to be created; and while the surplus in this case may be unnecessarily large, there does not seem to have been any bad faith or abuse of discretion on the part of those charged with the construction of the improvement. The courts should not scan too jealously their conduct in this connection if there be no reason to doubt that they were animated solely by a desire to promote the public interests, nor can they undertake to measure with nicety the exact amount of water required for the purpose of the public improvement. Under the circumstances of this case we think it within the power of the State to retain within its immediate control such surplus as might incidentally be created by the erection of the dam. So far, however, as land was actually taken for the purpose of this improvement, either for the dam itself or the embankments, or for the overflow, or so far as water was diverted from its natural course, or from the uses to which the riparian owner would otherwise have been entitled to devote it, such owner is undoubtedly entitled to compensation."

Many authorities could be cited to sustain the views thus expressed, but we need not dwell longer upon this feature of the case.

The defendant purchased the property rights and franchises of the Roanoke Navigation Company at a judicial sale under a decree entered in a suit authorized by the Acts of 1875, and by Private Acts of 1885, chap. 57, the Legislature ratified what had been done, and vested in the purchaser as a corporation "the franchises, rights, privileges, works, and property of the Roanoke Navigation Company, as acquired by the sale, including the right to use the water of the Roanoke River to be drawn through the canal for navigation, manufacturing, and other purposes, and the right to own, use, and enjoy the water power of the Roanoke River Navigation Company," with this restriction, set forth in the sixth section of the act:

"That. this act shall not materially interfere with the legal or vested rights of any person owning or operating mills in Northampton County, or prevent any person owning land on Roanoke River from operating or erecting any mill or other structure to be operated by water power, and using the water of said river for operating said mill or other structure: *Provided,* in so doing he shall not interfere with the legal or vested rights of any other person or corporation in any unreasonable manner."

By chapter 2 of the Private Laws of 1891 the incorporation of the plaintiff was validated, and certain rights, franchises, and privileges conferred upon it, and, among others, the right to erect mills and factories on the lands which are situated on the Roanoke River, below those of the defendant, and to use the water power of the river for the purpose of operating the same, with this proviso: "That in the construction and maintenance of said dams, canals, and waste-ways and in the development and use of said water power, neither the rights or property of persons owning lands on the Roanoke River, nor the rights, franchises, privileges, or property of any other corporation, shall be interfered with or encroached upon in any unreasonable manner to the substantial injury of any other person or corporation." We think it is evident from these provisions that this right to use the water of the river for manufacturing purposes was conferred upon both corporations, with the restriction or qualification that in the use and enjoyment of those

159—26

rights they should not unreasonably interfere with each other.
Why should the Legislature give to the plaintiff the right to
build mills and factories on its lands and to operate the same
with power drawn from the river if it had already conferred
upon the defendant rights and franchises in conflict with this
grant and utterly destructive of it? It was clearly intended that
both companies should use and enjoy this right to use the water
of the river without unreasonable interference with each other.
The very words of the proviso to the defendant's charter are
that it shall not, in the exercise of its rights and privileges,
"prevent any person owning land on Roanoke River from oper-
ating or erecting any mill or other structure to be operated by
water power and using the water of said river for operating
said mill or other structure." It further provided that any
such lower proprietor in the use of this river and its water
power should not interfere unreasonably with any other person
or corporation. We do not think that the word "person" as used
in the two charters should have the restricted meaning which
defendant's counsel insist upon. The context shows that it was
intended to embrace corporations, and the law requires us to
give it that meaning unless the statute clearly forbids it. Re-
visal, sec. 2831 (6). The legislative policy was a wise and just
one. It permitted the defendant to use the waters of the river
for manufacturing purposes in a reasonable manner, that is,
so as not to interfere with a like reasonable use by lower pro-
prietors on the stream. The Legislature did not intend to con-
fer a monopoly, in the use of the river, upon the defendant.
The language of the two statutes forbids that any such con-
struction should be placed upon this provision and any such
exclusive and extraordinary right conceded to the defendant.

The plaintiff has exercised its rights and privileges with
respect to the river in strict accordance with the terms of the
statute by returning the water diverted therefrom to the orig-
inal channel before it reaches the land of any lower proprietor,
and no one has complained of such use. The defendant may,
perhaps, pursue a similar course, and get the full benefit of all
the water it needs for its purposes.

There is no question of condemnation before us.

It is admitted that any extension of defendant's dam will materially impair the plaintiff's works by withdrawing water from the river which is necessary to the successful operation thereof.

The following admission also appears in the case:

"All the water drawn into defendant's canal ·is ·to develop power for manufacturing purposes, and is used solely for those purposes; that said canal, by reason of the works of the defend- ; ant, is so disconnected from the river that boats cannot pass from one to the other, and that defendant has no purpose of opening up or using said canal for navigation purposes, unless there should arise some public requirement therefor."

Upon the facts thus admitted there has been a clear violation of the plaintiff's rights which were acquired by the Acts of 1885 and 1891. No one can safely venture to say that such a use of the river as is contemplated by the defendant is a reasonable one within the manifest meaning of those statutes. We need not consider what the plaintiff's rights are apart from the legislative grant.

We have assumed, for the sake of discussion, that the Legislature had the power to confer upon the parties the rights, franchises, and privileges, with respect to the waters of Roanoke River, which are named in the acts of 1885 and 1891, and if so, each party must accept and enjoy them subject to the conditions and restrictions annexed thereto.

Having passed upon their respective rights under those statutes, it is unnecessary to decide whether the plaintiff has certain riparian rights, as the owner of land bounded by the river, which are property and valuable as such, and which cannot be arbitrarily or capriciously destroyed or impaired. Such rights, when once vested, though they must be enjoyed in proper subjection to the rights of the public, as, for instance, the right of navigation, it is said that the owner can only be deprived of them in accordance with established law, and if necessary that they be taken for the public good, upon due compensation. *Yates v. Milwaukee,* 77 U. S. (10 Wall), 497. Nor is it material to inquire whether the river is navigable or unnavigable, as any right the defendant has as

an upper riparian proprietor and any acquired by the statutes to which we have referred must be exercised with due regard to the rights of the plaintiff in the stream and subject to a reasonable use by it of the waters thereof for the purpose of generating power to operate its mills or factories. The plaintiff is not interfering with any lawful right to the water of this defendant or with the rights of any lower proprietor. It concedes the right of the defendant to use so much of the water as was required by its predecessor and as it was appropriating at the time it extended its dam, but it denies that it can divert more than that quantity into its canal and unreasonably interfere with the plaintiff in the use and enjoyment of its property, and it is argued that if defendant can thus encroach upon the plaintiff's water rights and privileges, it can stretch its dam across the entire river and deprive the plaintiff of all use of the water.

It having been admitted that the extension of defendant's dam beyond what is known in the case as the "wing dam" has and will seriously injure the defendant's works lower down the stream, by preventing the natural flow of the water thereto, we held before, and now decide, that an injunction should issue as indicated in our former opinion.

We see no reason, after a protracted and careful consideration of the case, for reversing or modifying the original judgment.

Petition dismissed.