This action was brought by the plaintiff to recover damages for the interference, by the defendant, with its water rights in the Roanoke River, and to enjoin the defendant from further interference therewith. The case was heard in the court below upon the following facts, which were agreed upon by the parties and submitted to the court for its decision:
1. The plaintiff and the defendant are corporations duly chartered and organized under the laws of this State.
2. The plaintiff was originally chartered under the name of "The Great Falls Water Power, Manufacturing and Improvement Company," but its corporate name was changed to that which it now bears by an act of the General Assembly, passed at the session of 1895. With this change in its corporate name, it exists under and by virtue of letters of incorporation, granted 18 August, 1890, by the clerk of the Superior Court, and by an act of the General Assembly, amendatory of said letters, ratified 20 January, 1891, which act is to be considered as a part of this case.
3. The defendant company is successor to the Roanoke Navigation Company, which company derived its charter rights from the (475) following acts of the Legislature: (a) Acts of 1812, ch. 848; (b) Acts of 1815, ch. 896; (c) Acts of 1816, ch. 929;(d) Acts of 1817, ch. 959; (e) Acts of 1885, ch. 57.
4. On June 1st and 8th, 1880, in a quo warranto proceeding against the Roanoke Navigation Company, then pending in the Circuit Court of the city of Richmond, Va., which was instituted pursuant to a resolution of the General Assembly of Virginia, adopted at session of 1877 and 1878, judgments were entered, copies of which are hereto attached as a part of the facts agreed. There was no appeal from said judgments, and the court had jurisdiction to hear and determine said proceedings, *Page 455 
in so far is they affected the privileges and franchises exercised by said company within the State of Virginia, and no further. The effect of the proceedings and judgment in the said cause was to vacate and annul the charter of the Roanoke Navigation Company in Virginia and to restrain the said company from exercising any of the franchises, powers and privileges granted by the charter which it received from the Legislature of that State.
[EDITORS' NOTE: MAP IS ELECTRONICALLY NON-TRANSFERRABLE.], SEE 152 N.C. 455.]
5. The navigation of Roanoke River was opened up by the Roanoke Navigation Company, pursuant to its aforesaid charters, from Weldon, N.C. westward to Clarksville, Va., and beyond. The boats used in this navigation were known as bateaux, from 60 to 65 feet long, 6 to 8 feet wide, drawing, when loaded, about 18 inches of water, with a capacity of from 5 to 8 tons each, and were propelled by poling.
6. The works and improvements of the Roanoke Navigation Company between Weldon, N.C. and Gaston N.C. consisted of two canals, *Page 456 
one around Eaton's Falls and the other, being the main canal, around the Great Falls. From the head of Eaton's Falls, which is a little over half a mile below Gaston, to the foot of the Great Falls at Weldon, the river falls about 104 feet, and from the head of the Great Falls to the foot thereof at Weldon, a distance of about 9 miles, and around which the main canal of the Roanoke Navigation Company was cut, the river falls about 90 feet. On account of these falls and other obstructions, there never has been, and cannot be, any water communication on Roanoke River between Weldon and Gaston, except by mans of said canals.
7. The obstructions to navigation between Gaston, N.C. and Clarksville, Va., were projecting ledges, points of rock, and steep slopes at falls or rapids occurring at intervals along said river, most of them being of minor importance, but several being of such character as to require considerable effort and expenditure to effect safe channels through or by them for the aforesaid bateaux. These obstructions (476) were removed by the Roanoke Navigation Company with the aid of wing dams, and by blasting and cutting sluices through them, so that channels were secured through or by them, sufficient for the safe passage of the bateaux heretofore described. Ordinarily, it required seven days for these boats to make a round trip between Gaston and Clarksville; occasionally it was done in five days. The navigation so established by the Roanoke Navigation Company, begun about 1824, continued for many years, and reached large proportions. The country along the river between said points was then, and is now, well settled and fertile and produced large quantities of tobacco, corn, wheat and cotton for market, practically all of which was transported over the river by bateaux until some time between 1850 and 1856, and during that period said boats carried into the adjacent country practically all of the goods, wares, etc., required for its use and trade; so that practically the entire commerce of said country, even beyond (477) Clarksville, up the Dan and Staunton rivers, was carried upon the river and canal. When said transportation was at its full height there were engaged therein on the river and canal about 353 of said bateaux, which carried a commerce of the estimated value of $6,000,000 per year. About 1854 or 1856, there having been built railroads to Gaston and from Manson, N.C. to Clarksville, Va., which furnished quicker or more expeditious transportation than said boats, the public ceased to patronize the boats on the canal from Weldon to Gaston, and navigation was discontinued. The canal ceased to be used thereafter, and the locks were not kept up, and got in such condition that boats could not pass through them, and have not since been used for navigation. At said time the transportation, by means of said boats from Gaston to Clarksville, also materially decreased until about 1864, *Page 457 
when the railroad from Manson to Clarksville was torn up. Thereafter the commerce upon said river by means of bateaux from Gaston, where they connected with the railroad, to Clarksville, again assumed large proportions, there being one firm of tobacco manufacturers at Clarksville who shipped by said boats one million pounds of manufactured tobacco a year during part of said time. There was also operated on Staunton River for several years, about 1875, a steamboat,"Nellie," of about 12 tons capacity, which plied the river from Randolph, about 15 miles above Clarksville, to about 17 miles above Randolph, and sometimes as far as Brookneal, about 30 miles above Randolph. The bateaux had traffic connections with the railroads, and through bills of lading for freight were issued. The bateaux continued to navigate the river from Gaston to Clarksville until about 1887, after which time only about three of the boats continued said navigation for about six months in the year, carrying about 1,000 bales of cotton and about 400 tons of fertilizer per year, until about 1893 or 1894. After that time traffic was entirely discontinued, except from Clarksville down the river for 18 or 20 miles, where some of said boats are still operating. It has never been practicable for said boats to pass some of the obstructions in said river between Gaston and Clarksville, except through the channels made by the Roanoke Navigation Company; and at present it is not practicable for said boats, when loaded, to ascend and descend the river between the State line and Gaston, owing to the fact that several of the works erected by said company are not in sufficiently good repair to furnish a safe way through said obstruction. The Roanoke River is navigable by steamboats of considerable size from its mouth to Weldon. At its mouth it communicates, by Albemarle Sound, with the ocean, and by the Dismal Swamp Canal with Norfolk, (478) Va. The aforesaid obstructions in the river between Gaston and Clarksville would prevent the passage of steamboats, but the river between said obstructions, which consist of ledges and points of rock and steep slopes at the rapids, is of a character and depth sufficient for the navigation of such boats of from 20 to 30 tons capacity. The Roanoke River from Gaston to Clarksville is from 500 to 1,300 feet wide, the water varying therein from 1 to 10 feet in depth. The places where the depth is 1 foot are at several rapids or ledges, where water flows over the same. The average depth of the river between said points, at low water, is about 2 1/2 feet. Congress has made appropriations which have been expended in the improvement of the navigation of the Dan and Staunton rivers above Randolph, which rivers by their conjunction form the Roanoke. A steamboat now runs on the river between Randolph and Brookneal, a distance of about 30 miles, over a part of the river so improved by the Government. *Page 458 
8. The distance by the river from Weldon, N.C. to Gaston, N.C. is 13 1/2 miles; from Gaston, N.C. to the State line is 24 miles, and from the State line to Clarksville, Va, is 30 miles.
9. The General Assembly of North Carolina, at its session of 1874`75, passed an act for the dissolution of the "Roanoke Navigation Company," which is to be taken as a part of this case.
10. The action for dissolution, which the Attorney-General, by said act, was authorized and directed to institute was brought in the Superior Court of Halifax County, and at the Fall Term, 1881, judgment of dissolution was rendered and a receiver appointed to take charge of and made sale of the property of the company. Said property was sold and conveyed by the receiver in 1883, the conveyance being to the purchasers under the corporate name of the "Roanoke Navigation and Water Power Company."
11. The General Assembly of North Carolina, as its session of 1885 (ch. 57), passed an act confirming said sale and conveyance, a copy of which act is herewith filed as a part of this agreement.
12. The defendant, so far as this action is concerned, has acquired no property other than that it acquired at the receiver's sale, except the purchase by it from Charles Shaw and wife, by deed dated 24 October, 1906, of the lower end of Moseley's Island, formerly known as Jones' Island, containing about 245 acres, which deed is recorded in Northampton County, in book 135, at page 218. The property acquired at (479) the receiver's sale consists, so far as this controversy is concerned, of a strip of land 165 feet wide, through which its canal flows around the Great Falls and extending from the upper terminus of said canal to the town of Weldon, a distance of about 9 miles, and 4 acres of land at the "locks" of the canal, which property it owns in fee; it was purchased and condemned by the Roanoke Navigation Company under its charter, and through its entire length a canal was cut. The boundaries of said 165-foot strip, especially the northern boundary thereof, are described in the award of Lanier and Armfield, and the agreement of 28 May, 1897, hereinafter set out.
13. A controversy having arisen between the defendant and one George P. Phillips, the owner of the Cadwallader Jones tract of land, as to certain rights claimed by Phillips as incident to his said land, and in order to test the right of defendant to use its canal and the waters of the river for manufacturing purposes, as against the alleged rights of Phillips, as owner of said land, the same was by agreement submitted to Messrs. M. V. Lanier and R. L. Armfield as arbitrators, who rendered their final award on 30 August, 1889. The submission and award are made a part of this case. Under the award, George P. Phillips was declared to be the owner in fee of a parcel of land lying on the southerly *Page 459 
side of said canal property. It is a triangular piece of land, the location of which will appear from a map annexed as an exhibit to this agreement. It is also declared that Phillips was the owner in fee of all the land between the northerly boundary of said canal property and Roanoke River. This is a narrow strip of land extending from the upper terminus of the defendant's canal easterly to the eastern boundary. These two parcels of land are indicated on the map as the "C. Jones" tract. On 1 February, 1892, the plaintiff purchased this property from Eva P. Phillips, widow and sole legatee and devisee of George P. Phillips, who died in 1891, the deed for which was duly recorded in Halifax County. The plaintiff had full notice of said award at the time of purchasing said land, and all its other property.
14. The defendant did not repair, improve or develop its said property, owing to its controversy with Phillips, until the same was determined as aforesaid. In January, 1890, it started to work on its property, enlarging its said canal through its entire length, a distance of about 9 miles, and completed this work some time in 1892, at an expenditure of over $100,000. About the time defendant commenced its work negotiations were opened by it with one T. L. Emry for the purchase of the tract of land indicated on the map as the t. L. Emry (or Moore) tract; but a price could not be agreed upon, (480) and defendant declined to purchase. Shortly thereafter Emry sold said tract to other parties designated in the following section as "promoters."
15. About three months after the defendant commenced this work, negotiations were opened by Emry with the promoters of the plaintiff company for the purchase of the Moore or Emry tract of land, designated on the map, with a view of forming the plaintiff corporation for the purpose of developing the power now owned by the plaintiff. This purpose coming to the knowledge of the Hon. J. D. Cameron, then president of the defendant company, he, on 19 September, 1890, addressed a letter to the president of the plaintiff company, to which letter the president of the plaintiff company made two replies. The substance of this correspondence was that the president of the defendant company claimed that the said company had acquired the right to the exclusive use of so much of the waters of the Roanoke River as it might, at any time, need for navigation, manufacturing or other purposes, and he objected to any use of the waters of the said river, or the construction of any dam or other works, by the plaintiff company, which would, in any manner, injure, impair or interfere with the property rights, franchises or privileges of the defendant company. The president of the plaintiff company claimed that his company did not intend to interfere with any of the legal rights of the defendant company which it had acquired in the *Page 460 
waters of the Roanoke River, but he denied that it had any right, exclusive or otherwise, at that or any future time, to use the waters of said river for purposes other than those of navigation, and asserted the right of his company to use the waters of the river not required for the said purposes of navigation and to have them flow down the entire channel of the stream, so that the lower proprietors and owners of riparian or water rights, on the margin of the stream, might have the free and uninterrupted use of the same. At the time said letter of 19 September, 1890, of the Hon. J. D. Cameron was written, the plaintiff had acquired the said Emry or Moore tract, and shortly thereafter its other properties and rights, which it holds in fee. Its said properties consist of a large body of land lying in, on and along both sides of and bounded by Roanoke River, along that stretch of said stream known as the Great Falls, and divided by said stream into two unequal parts, the one situated in Northampton County, North Carolina, and the other part in Halifax County, North Carolina. Its lands in Northampton County contain about 400 acres, known as the Squire, Garner, Grant, Thomas and Lee tracts, and have a continuous (481) river front of over 3 miles, extending from Green's Creek eastward down and along and bounded by the Roanoke River. Its lands in Halifax County contain about 2,300 acres, consisting of several tracts known as the M. A. Hamilton, T. L. Emry (also known as the Moore tract), B. T. Bockover, R. N. Ivey and C. Jones tracts, and have a continuous river front of between 4 and 5 miles, beginning at a point where the upper terminus of the defendant's aforesaid canal property (the aforesaid 165-foot strip of land) taps or touches Roanoke River, and thence eastwardly down and along and bounded by said river, and is divided by the aforesaid property of the defendant into two unequal parts or parcels. One of said parcels, and the smaller, is a narrow strip of land of varying width, lying between the northern boundary of defendant's canal property, which boundary has heretofore been defined, and Roanoke River. The other and larger parcel lies between the southern boundary of the aforesaid canal property of the defendant and Chocoyotte Creek. The plaintiff also owns in fee all the islands in Roanoke River, from Goat Island to Holly Island, inclusive of both; also Haynes and Crittendon Islands, below Holly Island. For a fuller description of the above-described properties, both of the plaintiff and the defendant, and for a better understanding of their location with reference to each other, reference is made to the map filed herewith as a part of this agreement. There are a number of small islands between Goat Island and Holly Island which are not shown on the map, it being considered necessary to give only the most prominent and important ones. *Page 461 
16. In the spring of 1891 the plaintiff began developing the water power of that part of Roanoke River flowing by and to its property. Its dams and other works for developing its said water power are located from 1 to 2 miles below the upper, and from 4 to 5 miles above the lower terminus of the defendant's canal so that all the water flowing into said canal is diverted entirely from plaintiff's property, works and dam, and carried past and beyond the same and discharged at the lower terminus of defendant's canal at Weldon. For a better understanding of the location of said dam and works, especially with reference to the aforesaid properties of the plaintiff and defendant, reference is hereby made to the aforesaid map or plat, marked "Exhibit P." Up to 1898, plaintiff had expended in the purchase of its property and rights and in developing its water power about $250,000, and since then it has expended about $200,000 more in such development.
17. The dimensions of defendant's canal, as constructed and used by its predecessors, the Roanoke Navigation Company, and which was cut and graded for navigation purposes, was about 25 feet (482) wide at the top of the water-level and 16 feet wide at its bottom, and from 2 to 3 feet deep and with a very slight fall or current. The quantity of water which was taken into and flowed through the canal did not exceed 50 cubic feet per second. The present dimensions of said canal are about 35 feet wide at the top of its water-level and 25 feet wide at its bottom, and about 4 feet deep, with an increased fall or current, it being enlarged and regarded for hydraulic purposes. In addition to such enlargement and gradation of the canal, the defendant, about the latter part of 1897, built a rock breakwater, constructed of loose stone piled together from or near the upper terminus of the canal and extending about one-third of the distance across Little River, and which was not further extended until some time in 1901, when the same was extended entirely across Little River. Plaintiff had no knowledge of the construction of said breakwater across said river until September, 1907, and on 30 October, 1907, it notified the president of the defendant company of that fact by letter, and threatened that unless the same was removed it would institute suit to abate the same and for damages. No dam or obstruction in and across said river or any part thereof was ever constructed by the Roanoke Navigation Company, except a wing dam, extending about 100 feet into said river at said point, and of less elevation than the aforesaid rock breakwater. By reason of the enlargement and gradation of said canal the greater part of the flow of said Little River, during the stages of low water, is diverted into the canal and from the property of the plaintiff. The defendant's canal, as enlarged and with said dam across Little River, diverts substantially a greater quantity of water than the old canal diverted. Little River is the smaller of the two *Page 462 
channels made by Roanoke River dividing and flowing around Moseley's Island. It carries one-fourth of the flow of the entire river whereas the other and larger channel carries three-fourths of said flow. The waters of the larger channel are made inaccessible to defendant's canal by said island, as their works are now constructed, but both channels unite at the lower end of said island and before reaching the mouth of the plaintiff's canal. All of which is shown by the annexed map or plat.
18. All the water drawn into defendant's canal is to develop power for manufacturing purposes, and is used solely for that purpose; the canal, by reason of the works of the defendant, is so disconnected from the river that boats cannot pass from one to the other, and defendant has (483) no purpose of opening up or using said canal for navigation purposes, unless there should arise some public requirement therefor.
19. While before the erection of said dam by the defendant, plaintiff had expended over $300,000 in the purchase and development of its property, and was still making large expenditures in the development of its water power for future leases, the plaintiff and the few lessees of its water power had been little, if any, inconvenienced by the diversion of water by the defendant, and had sustained little actual damage thereby until within four or five months of the institution of this action. For these reasons the plaintiff had made no demand upon the defendant to abate such diversion. In 1902 the plaintiff was negotiating for other leases, and, actuated by this and also by the information that defendant contemplated increasing such diversion, the president of the plaintiff company, on 13 December, 1902, wrote the president of the defendant company, protesting against such action. During the year 1906 plaintiff succeeded in making large leases of its power, to be furnished, by 1 September, 1907. When demand was made upon it for such additional power it was unable to supply a large part thereof, on account of the diversion of water by defendant, and this inability continued for several months during the fall of 1907 and until the plaintiff could make large additions to its dam it was then extending across the river.
20. As shown by the map hereto annexed, plaintiff has now extended its dam entirely across the river, by which it is enabled to develop water power to the amount of 8,000 horse-power, but with its present works and developments it will require the entire flow of the river in its normal stages to enable it to do so. The defendant's canal, by reason of its said enlargement and grading and the extension of said breakwater or dam, diverts water from plaintiff's canal and works, which, if allowed to flow into them, would develop a large amount of power. Of this 8,000 horse-power, plaintiff has already leased 4,000, and the lessees thereof have been using the same since 1 January, 1908. The remaining 4,000 horse-power will be converted into electrical power, and the *Page 463 
plaintiff has erected and equipped a power house for generating the same. Of this electrical power it has leased about 800 horse-power and can dispose of the remainder within the next one or two years, unless the aforesaid diversion of the defendant continues.
21. The water which the plaintiff claims the right to draw into its canal to develop said 8,000 horse-power is for use in the manner and for the purposes following, to wit: A sufficient quantity of said water is to be delivered from its canal, through pipes or sluices, (484) to the wheels or turbines of the owners of the mill sites, Nos. 1, 2 and 3, on the lands of the said mill owners, to generate in conjunction with said wheels or turbines, under the head of water maintained in the canal, 4,000 horse-power. This power is for the operation of the mills and machinery of said mill owners upon their said lands. This is the 4,000 horse-power plaintiff has already leased, as aforesaid. Mill site No. 1 is owned by the United Industrial Company, No. 2 by the Roanoke Mills Company, and No. 3 by the Roanoke Rapids Paper Manufacturing Company, and are located as shown on the map herewith filed. They were originally parts of the Emry or Moore tract of land. Sites Nos. 1 and 2 were donated, and mill site No. 3 was sold and conveyed by plaintiff in consideration of the donees and grantees erecting mills thereon and leasing water power from the plaintiff to operate the same. The water taken by said mills from plaintiff's canal is discharged and returned to the river from said mills before passing the lands of any other riparian proprietor, and flows down the river, along plaintiff's lands. The remainder of the water is to be used to operate the electric-power plant located on plaintiff's lands, by which the plaintiff proposes to generate 4,000 horse-power. This power will be transmitted and used to operate machinery or mills to be erected by plaintiff, or used by other parties when plaintiff may be able to lease the same. The water used to generate said power is discharged on plaintiff's land and returned to the river before passing any other riparian owner. Eight hundred horse-power has been already leased, to be used in the operation of mills on mill sites Nos. 1 and 2. The plaintiff has now no mills or factories upon its lands, other than the said electrical power house.
22. The main contention of the plaintiff in this action is that it has the right to have abated or enjoined the alleged diversion by the defendant of the water of Roanoke River into its canal; and while it is admitted that plaintiff has thereby sustained such damages and will continue to sustain such damages so long as substantial diversion continues, if said diversion or any part thereof, is wrongful, it is agreed that there shall be no recovery of actual damages in this action, but this shall be without prejudice and with the reservation to the plaintiff of the right *Page 464 
to institute a separate action for any damages it has already or may hereafter sustain; but the aforesaid admission, which is made for the above purpose, that plaintiff has sustained actual damages, shall not be used as evidence against the defendant in any action it may hereafter institute against the defendant for the recovery of damages. It (485) is further agreed that no such subsequent action shall be barred by the statute of limitations further than it already is.
23. In 1896 a controversy arose between the plaintiff and the defendant as to the location of 4 acres of land owned by the defendant at or near the locks, and as to other matters; and in order to adjust and settle the same the plaintiff and defendant entered into a written agreement for that purpose. When this agreement was entered into, the contentions of the plaintiff and the defendants as to their respective rights to the use of the water of Roanoke River were well understood by them. At the time of entering into this agreement plaintiff knew that defendant had enlarged its canal to its present dimensions and was using the water solely for manufacturing purposes. The plan adopted by the defendant and put into execution for developing its water power was to utilize the water drawn into its canal, first, at the "locks," about 4 miles below the upper terminus of its canal, where all the water so used was and is returned to said canal, from which point it flows through said canal to Weldon, and is used and discharged. The plan adopted by the plaintiff for developing its water power was in the manner and at the place its said power is now developed and used. These respective plans were known and understood by both parties before and at the time of the aforesaid agreement, and the same was entered into in furtherance of said plans.
24. At the time said agreement of 28 May, 1897, was entered into the defendant had not leased any of its water power. Its first lease of power was to the Weldon Cotton Manufacturing Company, on 1 February, 1899, when it contracted to furnish it with horse-power to an amount not to exceed 250 horse-power. Said company had never used to exceed 100 horse-power. In the summer of 1900 defendant commenced the erection of a power house at the "locks," located about 4 miles below the upper terminus of its canal. In contemplation of such erection, the defendant contracted with the Patterson Textile Company on 29 August, 1900, to furnish it with not exceeding, 1,000 electrical horse-power, beginning on 1 January, 1901. It did not begin to furnish the power until 1 September, 1901, It has furnished at no time to exceed 800 electrical horse-power.
25. Defendant, relying on the decisions in the George P. Phillips case
and the case of Bass v. Navigation Company, 111 N.C. 439, as a determination of its rights to enlarge its canal and use the water of the *Page 465 
river drawn through it for manufacturing purposes, did enlarge and repair the same, at the expense aforesaid, to wit, over $100,000, and built thereon a large corn and flour mill, at Weldon, an electric-power house at Weldon, which furnishes electric lights for said town, (486) its stores, factories and residences, and an electric-power plant at Roanoke Rapids, which furnishes electric lights to said town, and power, by transmission, for the operation of a large damask mill of the Patterson Textile Company at Rosemary. Said improvements cost about $300,000. Defendant's canal is so constructed that it can use the water drawn through the same to operate its power plant at its lock at Roanoke Rapids, under the fall of about 30 feet, and by reason of said locks return the same water to the canal, so that it is carried on to Weldon, where it is again used under a fall of 45 feet. Plaintiff has in its canal only one fall of about 30 feet. The Patterson Textile Company, heretofore referred to, desiring to build a large damask mill at Rosemary, to be operated by power from defendant's canal, and being advised of plaintiff's contentions that defendant had no right to draw water from the river in excess of that used by the Roanoke Navigation Company, or to apply the same to manufacturing purposes, before building said mill examined the decisions in said Phillips and Basscases, and, being advised that they were, and relying on them as, adjudications of the said questions in favor of the defendant, erected and said mill, depending upon the power of defendant's canal for its operations, and entered into a contract with defendant accordingly to furnish it not exceeding 1,000 electrical horse-power. Said mill cost about $350,000. The Weldon Cotton Manufacturing Company's mills were also built on defendant's canal, to be operated by its power. The aforesaid Patterson Textile Company's mills and the town of Roanoke Rapids can be served as readily from the power plant of the plaintiff as from that of the defendant. The corn and flour mill of the defendant was completed in 1892, and its power house at Weldon was erected in 1898.
It was further agreed by the parties that the presiding judge should hear and determine the matters in controversy upon the case agreed, and enter judgment accordingly. Judgment was rendered in favor of the defendant, denying the plaintiff's prayer for an injunction, and dismissing the action. Plaintiff, having duly excepted, appealed to this Court.
This action was brought by the plaintiff to recover damages for nuisance which, it alleges, was committed by the defendant, and to enjoin the continuance of the same, *Page 466 
which the plaintiff also alleges has caused special damage to (487) it by reason of the diversion of the waters of the Roanoke River from the usual and natural flow, by and along the lands of the plaintiff, which are situated below the intake or upper end of the defendant's canal.
The plaintiff bases its right to recover on the ground that as the owner of the land through which the river would flow in its natural state, it is a lower riparian proprietor, and that the defendant has no legal right to so obstruct the flow of the water in one of the prongs of the Roanoke River, known as Little River, as to diminish the volume of water which would otherwise flow by and through plaintiff's land, except to the extent that the defendant may have acquired the right, under the charter of its predecessor, the Roanoke Navigation Company, to use the water and for that purpose to obstruct the flow of said stream in a reasonable manner and consistently with the rights and privileges granted to it.
We think the decision of the case must depend upon the construction of the charters of the Roanoke Navigation Company, under which the defendant claims, and all the acts of Assembly which relate to the rights and privileges of that company and of its successor, the defendant, with regard to the use of the waters of the Roanoke River for the purposes specified in the said act.
Laws 1812, ch. 848, provides only for improving the navigation of Roanoke River from the town of Halifax to the place where the Virginia line intersects the same. It is not necessary that we should refer to the acts of 1815 and 1816, which amended the act of 1812, because the provisions of those acts do not affect materially the decision of the question presented in this case. By the act of 1817 the Legislature of this State adopted an act which was passed by the General Assembly of Virginia in 1816, and which provided for improving the navigation of the Roanoke River and its branches. It is provided in sections 4 and 5 of the latter act as follows:
"Whereas some of the places through which it may be necessary to conduct the said canals may be convenient for erecting mills, forges and other waterworks, and the person possessing such situations may desire to improve the same:
"Be it therefore enacted, That the water, or any part conveyed through any canal cut or made by the said company, shall not be used for any purpose but navigation, unless the consent of the proprietors of the lands through which the same shall be led be first had; and the said president and directors, or a majority of them, are hereby empowered and directed, if it can be conveniently done, to answer (488) both the purposes of navigation and the waterworks aforesaid, to enter into reasonable agreements with the proprietors of *Page 467 
such situations, concerning the just proportion of the expenses of making large canals or cuts capable of carrying such volume or volumes of water as may be sufficient for the purposes of navigation, and also for any such waterworks as aforesaid; but in no case whatever shall the owner or proprietor of such land, through which any canal may be cut as aforesaid, withdraw from any canal cut by the aforesaid company the water for the purpose of working any mill, forges or other waterworks whatever."
The act of 1812 provided only for improving the navigation of the Roanoke River, and made no provision for the use of its waters for any other purpose. It is contended by the defendant that the act of 1817, the provision of which we have just quoted, enlarged the rights, privileges and franchises of the Roanoke Navigation Company so that, by the said act, it acquired not only the right to improve the navigation of the river, but also to use its waters for manufacturing and other purposes, and that by reason of the provisions of the said act it was not restricted in the quantity of water taken by it from the stream to so much as might be necessary only for the purpose of navigation, as it was by the act of 1812. In the exercise of the rights, privileges and franchises conferred by the said acts, the Roanoke Navigation Company constructed a canal and diverted the waters of the river into it by what is known in the case as a "wing dam," which extended about 100 feet into the river. The navigation of the river through the said canal began in 1824 and continued until 1854, when it was abandoned, and it has not since been resumed. The plaintiff has extended the said wing dam entirely across Little River, and has thereby practically obstructed the flow of the stream, so that the plaintiff does not receive any benefit therefrom, but the use of the said river by it, as a riparian owner or proprietor, if it is entitled to be so considered, has been totally destroyed.
It is clear from the statement of facts which we have made, that the defendant, by the dissolution and sale of the franchise and property of the Roanoke Navigation Company, under the act of the Legislature of 1874-'75, and by virtue of the judicial proceedings authorized by the said act, did not, by the deed of the commissioner, which was made under a decree of the court, acquire anything except "the rights, franchises, privileges, works and property of the Roanoke Navigation Company, between the towns of Gaston and Weldon and at Weldon." The deed of the commissioner, Mr. Hill, does not convey anything else, nor does Laws 1885, ch. 57, which ratified the sale and (489) conveyance of the commissioner, confer any other rights, privileges or franchises, or vest in the defendant any other property or effects than those which were acquired by the deed of the commissioner. *Page 468 
The primary object, and we may say, the chief purpose of the acts of 1812 and 1817 were to promote and improve the navigation of the Roanoke River by the construction of a canal, and the right to use the water of the canal for the other purposes mentioned in the act of 1817 was intended to be subsidiary or subordinate to the main purpose, and not to permit the Roanoke Navigation Company to take more water from the river through its canal than should be necessary for improving the navigation of the stream. The Legislature did not contemplate that a greater quantity of water should be taken from the river than would be necessary for the purpose of navigation, and within this prescribed limit the Navigation Company was authorized to contract with the proprietors of lands bordering on the canal for the use of the water in the canal when required to supply motive power for milling, manufacturing or other industrial plants mentioned in the act. It would seem that the company placed this construction upon the act, because it so cut its canal with reference to the diversion of water from the river as to supply a sufficient quantity for the purpose of navigation only by erecting the wing dam, and while the canal was in use and operation for thirty years, it did not assert the right to obstruct the flow of the water to any greater extent than had been done in the beginning, nor was any attempt made to do so by its successor until about the year 1897, when it built a rock breakwater, extending about one-third of the distance across Little River, and which was not further extended to the other bank of the river until some time in the year 1901.
In the construction of the legislative acts under which the defendant acquired its rights, privileges and franchises as the successor of the Roanoke Navigation Company, by virtue of the judicial sale to which we have referred, we can derive little or no aid from the authorities, nor did counsel cite any. The original company constructed the wing dam under the power given to it by the act of 1812, as amended by the act of 1817, and deemed it sufficient for all purposes of navigation and so used it for a period of thirty years. It does not appear in this case that it was necessary to extend that dam to the opposite bank of the stream, for the purpose of supplying an additional quantity of water for improving the navigation of the river, as contemplated by the said act. It is very clear, we think, the Legislature, by the acts of 1812 and 1817, did not intend to permit any obstruction of the Roanoke River for (490) the sole purpose of using its waters for manufacturing purposes. The title and the language of the two acts forbid any such construction. The right to establish manufacturing plants on the canal was intended to be incidental to the navigation of the river, and the latter could be obstructed only to the extent that it was necessary to improve its navigation. The defendant contends that it has acquired the *Page 469 
right to obstruct the river by virtue of the act of 1885, ch. 57; but we do not think that statute will bear any such construction. It is provided by section 6 of the act as follows: "This act shall not materially interfere with the legal or vested rights of any persons owning or operating mills in Northampton County, or prevent any person owning land on Roanoke River from operating or erecting any mill or other structure to be operated by water power, and using the water of said river for operating said mill or other structure: Provided, in so doing he shall not interfere with the legal or vested rights of any other person or corporation in any unreasonable manner." The right given to the defendant by section 7 to erect buildings or make other improvements upon the canal for the purpose of manufacturing, and by section 1, to use the water of the Roanoke River, to be drawn through the canal, for navigation, manufacturing and other purposes, refers only, as the context of the act clearly shows, to the same rights, privileges and franchises that were given by the acts of 1812 and 1817 to the Roanoke Navigation Company. This construction of these two sections is entirely consistent with the language of section 6, which forbids the defendant from obstructing or interfering with the right of any lower riparian proprietor on the Roanoke River from erecting and operating any mill by the use of the water of the said river. And any other construction would nullify that section. The plaintiff has complied with the proviso in that section, for it appears in this case that the water which passes through its canal is returned to the river before it reaches the land of any lower proprietor and, therefore, there has been no interference by it with the right of any other person or corporation.
The next question presented in the case is whether the plaintiff is in a position to challenge the right of the defendant to obstruct the flow of water in the Roanoke River. We do not think it is necessary for us to decide, in order to pass upon this question, whether or not the plaintiff is a riparian owner, in the sense that it has the right to use the water of the river for manufacturing purposes, though there are authorities for the contention of the plaintiff that it has such right and all the rights of a riparian owner, and especially that it had "a (491) right to the undisturbed flow of the river which passed along the whole frontage of its property in the manner in which it had formerly been accustomed to pass." Land Co. v. Hotel Co., 132 N.C. 517; Gould on Waters, secs. 149 and 204; 1 Farnham on Waters, secs. 287-288 and 598-602; Yates v. Milwaukee, 10 Wall., 497; 29 Cyc., 333-335;Webster v. Harris, 59 L. R. R., 332; Lamprey v. State, 18 L.R.A., 670; Ceburn v. Ice Co., 51 L.R.A., 829.
But whether or not the plaintiff had the right to use the waters of the Roanoke River, as claimed by it, we think that the act of 1891, *Page 470 
amending its charter, does expressly confer such right, and that the proviso in subsection 2 of section 2 does not restrict its right in this respect, as, if the defendant acquired only the property rights, privileges and franchises of the Roanoke Navigation Company, the operations of the plaintiff do not interfere with its rights, if it had no authority to extend its dam across the river to the bank on the other side, but only the right to obstruct the river by the wing dam, which was built by its predecessor.
Nor do we think that the rights of the parties were changed or affected by their agreement, dated 28 May, 1897, or the correspondence between them, as it is evident from their express language that they did not intend to waive or surrender any of their rights, which are now in controversy in this case, but the said rights are distinctly reserved. The said agreement and correspondence were intended merely to provide a temporary arrangement between the parties, which was to last until the matters in dispute between them should be finally decided.
The defendant further contends that the plaintiff is concluded or estopped by the award which settled the controversy between George P. Phillips and the defendant, concerning the boundaries of the property of the defendant and its rights in the canal, the plaintiff having afterwards purchased the Phillips land. The fourth section of the award is as follows:
"The Roanoke Navigation and Water Power Company has the right under its charter, without the consent of the said Phillips, to enlarge its canal as it may see fit upon its own land aforesaid, but not to condemn land for such purpose, and it has also the right, without the consent of the said Phillips, to own, use and enjoy the use of the water of the Roanoke River to be drawn into or through said canal, as well for navigation as manufacturing and other purposes, and to rent or lease the same, and to erect and operate manufacturing establishments upon its own land, both that now owned or hereafter acquired under its (492) charter, or to rent or lease the same and to sell and alien any of its said property, all without the consent of the said George P. Phillips."
The arbitrators intended by their award merely to fix the boundaries of the defendant's property and to define its right to use the canal and the waters of the Roanoke River for navigation and manufacturing purposes, as conferred by the acts of 1812 and 1817, and to confine it within the limits prescribed by the said acts. This is apparent from the striking similarity between the words employed by the arbitrators in their award and the language of the two acts to which we have referred. They did not intend that the defendant should possess or enjoy any other rights, privileges or franchises than were acquired by the deed of *Page 471 
the commissioner, executed under the order of the court, and the act of the Legislature of 1885 which ratified the same. The question as to the quantity of water which the defendant was entitled to draw from the Roanoke River without the consent of Phillips was not submitted to the arbitrators for their decision, nor involved in the controversy between the parties, so far as appears from the submission or the award. The question which the arbitrators decided, and which was submitted to them, was whether the defendant, as between it and Phillips, had the right to divert any water from the river into its canal.
We have read carefully Bass v. Navigation Co., 111 N.C. 439, upon which the defendant relies as deciding what rights it has in the waters of the Roanoke river by virtue of the statutes and proceedings to which we have referred. We find only two questions decided in that case, and they are: (1) Whether, by the dissolution of the corporation known as the Roanoke Navigation Company the property which it acquired by purchase or otherwise reverted to the original owners; and (2) whether the parol license to construct a bridge over the canal, which was formerly given by the Roanoke Navigation Company, was revocable. The Court decided that there was no reverter and that the license was revocable. We do not see how the questions now under consideration in this action were presented in that case, and the language of the Court excludes the idea that they were considered or decided. We are, therefore, of the opinion that neither the award in the Phillips case nor the decision in the Bass case adjudicated the rights of the parties which are involved in this suit, nor do they render applicable to this case the rule of stare decisis, as laid down in Hill v. R. R.,143 N.C. 539, as they establish no rule of property, pertinent to the facts of this case, which require us to adhere to them as decisive of the questions we now have under consideration. If the arbitrators in thePhillips case, or the Court in the Bass case, intended to pass upon the question as to whether the defendant had (493) the right to extend its dam across Little River so as to completely obstruct the stream and thereby to prevent the use of the waters of the river by the lower riparian proprietors, they would have made some reference to the right of the defendant so to do, in plain language. Instead of doing so, it was assumed that the defendant possessed only the rights and privileges, with reference to the river and the diversion of its waters, which it acquired from the Roanoke Navigation Company, and which had been conferred upon the latter by its charter and the amendments thereof.
It appears in the case agreed that the defendant has acquired, by prescription if not by purchase at the judicial sale, the right to obstruct the flow of Roanoke River by continuing to maintain what is known in the case as the "wing dam," which was originally erected by its predecessor, *Page 472 
but it has no right to impede the flow of the stream beyond the end of said dam, that is to say, by any extension of the same, and to the extent that it has done so it should have been enjoined by the court below, as there has been no sufficient delay by the plaintiff in asserting its right to the removal of the obstruction to constitute an acquiescence on its part or an estoppel against it. Pugh v. Wheeler, 19 N.C. 50; Emry v. R. R.,102 N.C. 232; Greer v. Water Co., 127 N.C. 349. The plaintiff has acquired no easement, as against the lower proprietors on the river, to obstruct the same. Griffin v. Foster, 53 N.C. 337.
The question as to the amount of damages the plaintiff may be entitled to recover is not now before us upon the case agreed. Our conclusion is that the court erred in refusing the injunction, to the extent above indicated, and the case is, therefore, remanded to the court below, with instructions to issue an injunction against the defendant, restraining it from maintaining the dam across Little River, except that part of the said dam which was originally erected by the Roanoke Navigation Company, and which is known in the case as the "wing dam." The amount of damages which the plaintiff is entitled to recover will be determined hereafter, according to the stipulation contained in the case agreed.
Error.
Cited: S. c., 159 N.C. 394; R. R. v. Light Co., 169 N.C. 476, 478.
(494)